ANGLO AMERICAN AUTO AUCTIONS, INC., d/b/a ARENA AUTO AUCTION, INC., Claimant, *v.* THE STATE OF ILLINOIS and ILLINOIS SECRETARY OF STATE, Respondents.

*Opinion filed May 10, 1994.*

BIXBY, LECHNER & POTRATZ, P.C. (GARY P. HOLLANDER and WILLIAM J. TURNER, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (TERRANCE McWHORTER, Assistant Attorney General, of counsel), for Respondents.

## OPINION

SOMMER, C.J.

These claims arise from two separate inquiries which the Claimant made to the Uniform Commercial Code Division of the Secretary of State concerning any and all U.C.C. financing statements on file related to a particular entity, "Mecum's Countryside Motors, Inc." Both inquiries were made via form U.C.C. 11.7, the first occurring on or about December 6, 1990, and the second slightly over seven weeks later on or about January 25, 1991. In responding to the first inquiry, the U.C.C. Division reported that there was "nothing on file" as of December 7, 1990. Before the U.C.C. Division responded to the second inquiry, the Claimant itself had already recorded a U.C.C. financing statement against "Mecum's Countryside Motors, Inc." with the Secretary of State on January 28, 1991. The U.C.C. Division identified that financing statement and no others in responding to the Claimant's second inquiry.

As it turned out, both in making its inquiries and in filing its own financing statement, the Claimant had supplied the U.C.C. Division with an erroneous name for the entity. Instead of being "Mecum's Countryside Motors, Inc.," the actual name of the entity at all times was "Mecum's Countryside Motor Companies, Inc." A subsequent search of the U.C.C. records under the correct name revealed that another creditor, Amcore Bank, N.A., Rockford, had a properly-filed financing statement which was of record prior to the date of the Claimant's initial inquiry to the U.C.C. Division, and that bank has now been adjudicated as having a superior lien on vehicles which the Claimant actually provided to the misidentified entity. See *Arena Auto Auction v. Mecum's* (1993), 251 Ill. App. 3d 96, 621 N.E.2d 254.

In the instant Court of Claims proceedings, the Claimant essentially alleges:

(1) That it was "unaware" of the correct name of the entity at the time of its requests.

(2) That the Secretary of State owed it a duty to respond to its inquiries by reporting not only information about the requested entity but also "information on all debtors whose names are substantially similar to that of the (requested) debtor," and

(3) That as a result of the Secretary of State's breach of that duty, it was damaged.

The State has filed a motion to dismiss in which it contends that the Claimant has misidentified the duty of care. According to the State, the Secretary of State's U.C.C. Division was only legally required to search its records for the particular entity which the Claimant had requested and nothing more. In support of its argument, the State has submitted an affidavit from the administrator of the U.C.C. Division which states that, from its inception, the division has limited its searches to "the particular debtor name and address as requested by the searching party." The Claimant has not tendered any counteraffidavits or other evidence on that point but has instead filed a motion for summary judgment in which it contends that it has properly stated the duty of care.

As a matter of law, the duty of care is not as the Claimant wishes it were. The operative statute is section 9—407(2) of Illinois' version of the Uniform Commercial Code which provides in pertinent part:

"Upon request of any person, the filing officer shall issue his certificate showing whether there is on file on the date and hour stated therein, any presently effective financing statement naming a *particular debtor* and any statement of assignment thereof and if there is, giving the date and hour of filing of each such statement and the names and addresses of each secured party therein." (Emphasis added.) 810 ILCS 5/9—407.

While there are no reported Illinois decisions on point, the official commentary to this provision (which can be found in the Smith-Hurd annotated version of the statute) indicates that the plain language of the statute means what it says:

"Subsection (2) requires the filing officer on request to issue to any person who has tendered the proper fee his certificate as to what filings have been made against *any particular debtor* ° ° °." (Emphasis added.)

Cases from other U.C.C. jurisdictions construing their versions of Article 9 support such a reading of the statute. However, the bulk of the reported litigation over the particularity of debtors' names has occurred under a different portion of Article 9, namely section 9—402, which sets forth the formal prerequisites of financing statements. Two subsections of 9—402 are routinely examined:

"(7) A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor ° ° °." and

"(8) A financing statement substantially complying with the requirements of this Section is effective even though it contains minor errors which are not seriously misleading." 810 ILCS 5/9—402(7), (8).

Interestingly (but perhaps not surprisingly) this litigation occurs most frequently in the nation's bankruptcy courts, and a significant body of case law has developed there. All of these decisions have a common legal principle as their point of origin: the creditor filing the financing statement has the duty to be diligent in ensuring that the entity's name he places on the financing statement is correct. See, e.g., *In re Marta Group, Inc.* (1983), 33 B.R. 634, 639 (E.D. Pa.). From there, the cases decided under section 9—402 go on to arrive at widely divergent results as to whether a particular misnomer is or is not sufficiently erroneous to be "seriously misleading." As a matter of law, the determination is not based on a comparison of the wrong name to the correct name but rather on

whether a reasonable searcher would find the financing statement or would be put on notice to inquire elsewhere about it. See, e.g., *In re McGovern Auto Specialty, Inc.* (1985), 51 B.R. 511, 513 (E.D. Pa.):

"The resolution of the question cannot be made simply by comparing two names, but must be settled with an eye toward the intended operation of the UCC indexing system in which the errors are manifest. A reasonable searcher properly using the index is looking for the name of the debtor amid a host of similar names. The system may contain hundreds or millions of names, depending on the size of the index. The extent to which a reasonable searcher may correctly identify an erroneous listing as that of the debtor is dependent, of course, on the size of the index. Analogizing the UCC index to a telephone book is apt. Searching under an erroneous name would be much more difficult with the Manhattan phone book than with an eight page phone book for some rural county.

Furthermore, the type of index in use is a pertinent concern. The 'file box' method, the standard bearer of indexing for generations, with drawers full of cards that allowed a searcher to riffle through myriad cards, is becoming outmoded. The vanguard, of course, is the computer retrieval system, which in its simplest form would allow for no 'riffling' through related names. The entry of a single name into the system may well cause the computer to cite only those financing statements on which the name is identical to the name entered. No similar names would surface." *Id.*, 51 B.R. at 514.

While the Claimant argues in its brief that the advent of computer indexing in itself should broaden the scope of the search to be undertaken by the U.C.C. Division, Courts considering that scenario (such as *McGovern* above) disagree, viewing computers as making it even more difficult for a reasonable searcher to find a substantially similar match, and put the burden back on the party making the request:

"A computer search may require more precision in request-a name search." *In re Waters*, 90 B.R. 946, 960 (N.D. Iowa 1988.)

Courts have warned that "the *only* certainty is that a party will get filings under the *exact* name and spelling given, assuming no error by the clerk." (*In re Wardcorp Inc.*, 133 B.R. 210, 212 (S.D. Ind. 1990.) (Emphasis added.) Hence, a caveat to the requesting party has developed in the law:

"There can be less tolerance of errors in a debtor's name, since such errors may prevent a searcher from discovering the financing statement. If a searcher cannot find it, the searcher cannot be burdened with the duty of further inquiry.

The debtor's name is the primary indexing tool and inaccuracies may compromise the validity of a filing ° ° °. Any rule that would burden a searcher with guessing misspellings and misconfigurations of a legal name or that would make a searcher dependent on the discretion of the clerk conducting the search would not provide creditors with the certainty that is essential in these commercial transactions." *Id.*, 133 B.R. at 215.

To get an understanding of how this section 9—402 body of case law translates when applied instead to section 9—407(2), one need look no further than the very case which the Claimant has cited as the linchpin of its arguments. (*Borg Warner Acceptance Corp. v. Secretary of State* (1987), 731 P.2d 301 (Kan.).) Like the instant proceedings, *Borg Warner* was an action brought by a disgruntled requesting party against a Secretary of State for the alleged negligence of his employees in failing to report the existence of a particular prior security interest in response to a request for a U.C.C. record search. The operative portion of Kansas' version of section 9—407(2) was identical to that at issue in the instant Illinois cases. 731 P.2d at 303.

In 1977, a bank had filed a financing statement under the correct names of two individuals and under the slightly misspelled name of the entity which those individuals operated. In 1978, Borg Warner submitted a U.C.C. search request to the Kansas Secretary of State under the names of both individuals as well as under the *correctly*-spelled name of the entity. The Secretary of State did not disclose the bank's 1977 financing statement in his response. In 1980, Borg Warner submitted a second U.C.C. search request listing one of the individuals as well as the correct entity name. Again the Secretary of State did not identify the bank's 1977 financing statement

in the response. In 1983 a third search request was submitted by Borg Warner listing the correct names of both individuals and the correct name of the entity with similar results. It was not until Borg Warner made a fourth request of the Kansas Secretary of State in 1984 that the bank's 1977 financing statement was disclosed. By that point, of course, the entity was not only heavily in debt to Borg Warner but also bankrupt.

The determinative factor in establishing liability against the Kansas Secretary of State was *not* the similarity of the entity's correctly and incorrectly spelled names. Rather, that case turned on the fact that the Kansas Secretary of State cross-indexed all financing statements; in other words, the searches under the correct names of the individuals should have automatically revealed the financing statement which had been filed under the slightly misspelled name of the entity. (731 P.2d at 305.) Thus, liability was predicated on the Kansas Secretary of State having failed to disclose what would have been revealed to a reasonable searcher by the specific requests that had been made. No such allegation is raised in the instant proceedings against the Illinois Secretary of State. Further, there is no evidence to indicate that the Amcore Bank financing statement at issue here would have been revealed under either U.C.C. search request which the Claimant made.

One final note. Throughout these proceedings, the Claimant has consistently professed that it was "unaware" of the correct entity name at the time of its U.C.C. requests. However, the Appellate Court opinion indicates otherwise. Based on the evidence in the record from the underlying Circuit Court litigation over the Amcore Bank lien, the Appellate Court commented on a letter dated December 21, 1990 from the Claimant's treasurer addressed to the *correct* name of the entity:

"Obviously, Arena was aware of Mecum's actual corporate name prior to its submission of requests for information to the Secretary of State's office in January 1991. Its failure to turn up Amcore's security interest in the subject vehicles was the result of [its own] lax investigation, not misinformation." 251 Ill. App. 3d 101, 621 N.E.2d 258.

Accordingly, based on both the facts and the law, the Claimant's claims against the Secretary of State should be dismissed. The Secretary of State did not breach the duty of care owed to the Claimant.

It is therefore ordered that the Claimant's motion for summary judgment is denied and the State's motion to dismiss is granted, and the present claims are hereby dismissed.