OPINION OF THE COURT
Francis T. Collins, J.
In this action for employment discrimination in violation of the New York State Human Rights Law (Executive Law § 296), the claimant moves to amend his claim to allege additional incidents of discrimination and retaliation which occurred both prior and subsequent to the filing of the claim. Both the claim and the proposed amended claim allege that the claimant’s employer, the Department of Correctional Services (DOCS), created a hostile work environment through its policy and practice of allowing and condoning discriminatory and retaliatory conduct. The defendant cross-moves to dismiss the claim as untimely pursuant to CPLR 3211 (a) (2), (5) and (8).
The claim, which was filed and served on April 21, 2006, alleges that during the course of the claimant’s employment as a correction officer he was the victim of discriminatory practice “because of Creed, National Origin, Race, Color, Retaliation and Hostile Work Environment” in violation of the New York State Human Rights Law. As set forth in the claim, claimant is an Irish-American male whose employment with DOCS commenced on January 6, 1997. On May 30, 2002 while the claimant was assigned to Sing Sing Correctional Facility (Sing Sing CF) he allegedly “opposed and complained” of racial and “insensitive” remarks by his supervisor at the time, Sergeant Larry Phipps (defendant’s exhibit A, claim ¶ 3). In June of 2002 the claimant allegedly filed a complaint with the Superintendent of Sing Sing CF, Brian Fischer, and the Office of Diversity Management. No corrective measures were taken against Phipps, however, who continued to make racially offensive remarks such as “Irish drunks get their strength from the bottle” and “the Micks are nothing but North Atlantic spies” (defendant’s exhibit A, claim ¶ 4). Phipps also allegedly referred to Black American correction officers as “niggers” and Latino officers as “spies” (id.). As alleged in the claim, Phipps occasionally referred to the claimant’s Latino wife as a “dumb spic” and to Pope John Paul II as a “money hungry old man” (defendant’s exhibit A, claim ¶¶ 5, 6). He also allegedly stated that “all priests are child molesters” and that the claimant “must have been molested” since he was *944 an altar boy in his youth (defendant’s exhibit A, claim ¶ 6). Claimant alleges that as a result of these hostile conditions, he requested and received a transfer to Sullivan Correctional Facility (Sullivan CF) in January of 2003.
Claimant alleges that upon his arrival at Sullivan CF word had already spread of his “whistle blowing” regarding the conduct of his supervisors at Sing Sing CF (defendant’s exhibit A, claim ¶ 9). As a result, he alleges that after his transfer to Sullivan CF he was threatened and harassed by his supervisor, Sergeant Maxwell, against whom he filed a complaint with Superintendent James Walsh in July 2003. On July 23, 2003 Superintendent Walsh responded in a memorandum in which he stated, in part: “[E]very institution has its own organizational culture, identify [sic] and history. It might not be what you are used to or what you would prefer it to be. I suggest you would be best served by understanding this concept” (defendant’s exhibit A, claim ¶ 12).
Claimant alleges that he also complained to Lieutenant Jeff Keenan at Sullivan CF about Maxwell’s “harassment and retaliation” (defendant’s exhibit A, claim ¶ 14). However, Keenan disregarded his complaints and condoned the conduct of Maxwell and others (defendant’s exhibit A, claim ¶¶ 14, 15). In fact, claimant alleges that Keenan himself made derogatory racial and sexual remarks to both inmates and staff at the facility (defendant’s exhibit A, claim ¶¶ 16, 17). Claimant alleges that he complained to Superintendent James Walsh about Lieutenant Keenan’s conduct but that no disciplinary action was taken. For reasons not detailed in the claim, Maxwell instituted disciplinary action against the claimant resulting in a meeting on September 22, 2004 in which Superintendent Walsh indicated that the charge against the claimant for insubordination could not be established (defendant’s exhibit A, claim ¶ 19). On November 8, 2004 claimant allegedly notified DOCS Deputy Commissioner Lucien Leclaire of the retaliation by Maxwell and Keenan. Claimant alleges that on November 19, 2005 a racist cartoon was posted in a public area of the prison and that on or about December 2, 2005 he was harassed and assaulted by another white correction officer as the result of his “whistle blowing” (defendant’s exhibit A, claim ¶ 25). Allegedly with the encouragement of DOCS supervisors, the other white officer filed a false charge of harassment in the second degree against the claimant, resulting in his suspension from employment. Following his complaints to Governor Pataki and a State Senator, *945 the claimant was reinstated to his position as a correction officer. Claimant also alleges that since the filing of his first complaint with his superiors in 2002, he has continuously been denied a promotion. Based on the foregoing, the claimant alleges that “DOCS has a policy and practice of allowing and condoning discriminatory and retaliatory conduct and allowing the existence of a hostile working environment to the detriment of the Complainant” (defendant’s exhibit A, claim ¶ 31).
In the proposed amended claim, the claimant seeks to supplement the claim with additional instances of allegedly offensive and discriminatory conduct occurring both before and after the date the claim was filed. With respect to the conduct occurring after the claim was filed, claimant seeks to amend the claim to add the following: The claimant received and signed an excellent employment evaluation in February of 2006, which was later “illegally” altered without his acknowledgment and received by him in June 2006 (claimant’s exhibit A, proposed amended claim ¶ 85). He alleges that he filed various complaints in 2006, including one with the “EEOC” on December 13, 2006 (claimant’s exhibit A, proposed amended claim ¶ 90).
On April 7, 2007 Lieutenant Wayne Jordan allegedly made reference to the claimant as a “rat bitch” during the course of discussing: a report the claimant had filed regarding a prior assault by Jordan (claimant’s exhibit A, proposed amended claim ¶ 92). Jordan allegedly threatened to suspend him from employment if his conduct continued.
In May of 2007 the claimant was transferred to Willard Drug Treatment Campus after having requested the transfer in February for reasons unrelated to the allegations in the claim. Claimant alleges in his proposed amended claim that immediately upon his arrival at Willard he was harassed and berated regarding the prior complaints he had filed. He alleges that on May 30, 2007 an incident occurred while the claimant was undergoing training in the arsenal. Not having been instructed otherwise, the claimant left the arsenal with the key, conduct for which he was allegedly berated and verbally abused by his superiors. The incident caused the claimant to cry uncontrollably. He was treated by a nurse in the medical department and later that same day by his psychiatrist who diagnosed him with an anxiety disorder and a major depressive disorder due to “ ‘work related issues’ ” (claimant’s exhibit A, proposed amended claim ¶ 113). The claimant was suspended without pay on June 6, 2007 “due to [claimant’s] leaving assigned post with *946 a secure key” (claimant’s exhibit A, proposed amended claim ¶ 16). Claimant was out of work on medical leave at the time of his suspension. In June of 2007 claimant was issued a notice of discipline by Director of Labor Relations Peter Brown, and a recommendation of termination from DOCS for charges which had been filed against him. Claimant alleges that he “has been the target of racial comments and retaliation for his complaints to supervisors and administrators of DOCS since his arrival at the Sullivan Correctional Facility and Willard Drug Treatment Campus” (claimant’s exhibit A, proposed amended claim ¶ 120).
It is well established that “the Court of Claims does not obtain subject matter jurisdiction unless a claim, or a notice of intention to file a claim, is timely filed” (Matter of Best v State of New York, 42 AD3d 699, 700 [2007]). It is equally well established that a jurisdictional defect may not be cured by amendment of the original claim (Grande v State of New York, 160 Misc 2d 383 [Ct Cl 1994]). Recognizing these basic principles, the defendant argues that the claim is time-barred because the last discriminatory act set forth in the original claim occurred on December 2, 2005 and the claim was not filed until April 21, 2006, more than four months later. Defendant argues further that the claim may not be amended to include discriminatory conduct occurring after the date the claim was filed because to do so would impermissibly circumvent the rule against amendment of a jurisdictionally defective claim.
As a threshold matter, the parties do not dispute that the applicable period in which to file and serve a claim arising out of alleged violations of the Human Rights Law is 90 days from the date of accrual unless a notice of intention to file a claim is served within that time frame (Court of Claims Act § 10 [3]). Despite the lack of disagreement, however, few cases address the point. The few published cases to address the issue have applied the period of limitations applicable to a cause of action for unintentional tort (Court of Claims Act § 10 [3]), albeit without discussion (Brown v State of New York, 125 AD2d 750 [1986]; Bhagalia v State of New York, 228 AD2d 882 [1996]; Figueroa v State of New York, 126 Misc 2d 304 [1984]; Ferrer v State of New York, 172 Misc 2d 1 [1996]) and at least one unpublished decision in the Court of Claims has applied the period of limitations applicable to intentional torts (Syrkin v State of New York, Ct Cl, Apr. 5, 2006, Scuccimarra, J., UID No. 2006-030-524, claim No. 110738).
In Murphy v American Home Prods. Corp. (58 NY2d 293 [1983]) the Court of Appeals first recognized that a cause of ac *947 tion brought pursuant to the Human Rights Law (Executive Law art 15) is subject to the three-year statute of limitations set forth in CPLR 214 (2) stating:
“In enacting subdivision 9 of section 297, the Legislature created a new cause of action not previously cognizable, but, in doing so, provided no specific period of limitations for such action. Consequently the institution of civil actions to recover damages for unlawful discriminatory practices under subdivision 9 is governed by the three-year period of limitations prescribed in CPLR 214 (subd 2) applicable to ‘an action to recover upon a liability, penalty or forfeiture created or imposed by statute’ (emphasis added; contrast State of New York v Cortelle Corp., 38 NY2d 83, 86 [holding that statutory provisions did not create ‘new claims but only provide particular remedies and standing in a public officer’])” (id. at 307).
CPLR 214 (2) has been applied to alleged violations of the Human Rights Law in a wide array of cases since Murphy v American Home Prods. Corp. (supra). For example, in Koerner v State of N.Y., Pilgrim Psychiatric Ctr. (62 NY2d 442 [1984]) the Court held that the State is subject to suit on causes of action alleging violations of the Human Rights Law in either the Supreme Court or the Court of Claims and applied the CPLR 214 (2) three-year statute of limitations to the matter at issue therein. In that case, the action sought relief in the Supreme Court alleging improper termination of employment. In a similar context, it has been widely held that because a cause of action under the Human Rights Law is a statutory cause of action it is not, therefore, a tort for purposes of the notice of claim provisions of General Municipal Law § 50-e (see e.g. Parry v Tompkins County, 260 AD2d 987 [1999]; Polvino v Island Group Admin., 264 AD2d 720 [1999]; Morrison v New York City Police Dept., 214 AD2d 394 [1995]; Cervenka v New York City Tr. Auth., 216 AD2d 511 [1995]; Lane-Weber v Plainedge Union Free School Dist., 213 AD2d 515 [1995]; see generally Picciano v Nassau County Civ. Serv. Commn., 290 AD2d 164 [2001]).
Finally, in this regard, the Court of Appeals recently held in Matter of Amorosi v South Colonie Ind. Cent. School Dist. (9 NY3d 367 [2007]) that where a specific statute applicable to nontorts limited the time for suit to a period less than that available under CPLR 214 (2) the more specific provision and the lesser statute of limitations period applies. In Amorosi the *948 Court accepted the respondent’s argument that “the plain language of Education Law § 3813 (2-b) provides a one-year statute of limitations for all non-tort claims, including actions to redress discriminatory practices” (id. at 371 [emphasis added]).
It seems abundantly clear from the cases cited above that an action brought pursuant to the Human Rights Law is a statutory cause of action and not a traditional common-law tort. Inasmuch as section 10 (3) and (3-b) of the Court of Claims Act are expressly limited in their application to torts, whether unintentional (§ 10 [3]) or intentional (§ 10 [3-b]), the court holds that the periods of limitation specified therein are inapplicable to the instant claim. The court concludes that the controlling period for the timely service and filing of a claim alleging violations of the Human Rights Law is that set forth in Court of Claims Act § 10 (4) which applies to causes of action “not otherwise provided for by this section,” including causes of action created by statute (see e.g. Alston v State of New York, 97 NY2d 159 [2001]; Schwartz v State of New York, 162 Misc 2d 313 [1994]). Court of Claims Act § 10 (4) permits such a claim to be served and filed within six months following the date of accrual unless a notice of intention is served within that time. Consequently, even if it were assumed that the date of accrual is December 2, 2005 as urged by defendant, the claim which was served and filed on April 21, 2006 was nonetheless timely. In so holding, the court acknowledges that the Third Department held otherwise in Brown v State of New York (supra) and Bhagalia v State of New York (228 AD2d 882 [1996]). However, in view of the mounting precedent in both the Court of Appeals and the Appellate Division clearly holding that a cause of action under the Human Rights Law is not a tort, this court is persuaded that Brown and Bhagalia are no longer controlling.
Furthermore, the accrual dates applicable to a claim involving discrete instances of discrimination or retaliation differ from the date of accrual of a claim alleging a hostile work environment. A discrete retaliatory or discriminatory act is independently actionable and such a cause of action accrues on the date the wrongful act occurs (National Railroad Passenger Corporation v Morgan, 536 US 101, 110, 114 [2002]).* Discrete acts of discrimination consist only of discriminatory pay decisions, *949 including termination, failure to promote, denial of transfer, or refusal to hire (id. at 114; Ledbetter v Goodyear Tire & Rubber Co., Inc., 550 US —, 127 S Ct 2162 [2007]). A claim alleging a hostile work environment, on the other hand, occurs over a series of days or years and, in contrast to discrete acts, a single act of harassment may not be actionable on its own (National Railroad Passenger Corporation v Morgan, 536 US at 115). For example, while the mere utterance of a single offensive epithet does not sufficiently effect the conditions of employment so as to give rise to a discrimination claim, the cumulative effects of such repeated acts may (id. at 115). A hostile work environment claim exists “ ‘[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment’ ” (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 310 [2004], quoting Harris v Forklift Systems, Inc., 510 US 17, 21 [1993] [citation omitted]; Matter of Anagnostakos v New York State Div. of Human Rights, 46 AD3d 992 [2007]). A hostile work environment claim “is composed of a series of separate acts that collectively constitute one ‘unlawful employment practice’ ” (National Railroad Passenger Corporation v Morgan, 536 US at 117). Under the continuing violation doctrine, the commencement of the limitations period regarding such claims is delayed until the last discriminatory act occurs (Clark v State of New York, 302 AD2d 942, 945 [2003], rearg and appeal denied 305 AD2d 1127 [2003]; Matter of Henderson v Town of Van Buren, 281 AD2d 872 [2001]; Sier v Jacobs Persinger & Parker, 276 AD2d 401 [2000]; Walsh v Covenant House, 244 AD2d 214 [1997]; Matter of Town of Lumberland v New York State Div. of Human Rights, 229 AD2d 631 [1996]).
The continuing violation doctrine has also been applied to toll the running of the time limitations upon suit contained in the Court of Claims Act. Although a claim is generally held to accrue when damages become reasonably ascertainable (Local 851 of Intl. Bhd. of Teamsters v State of New York, 36 AD3d 672 [2007], Iv denied 8 NY3d 811 [2007]; Augat v State of New York, 244 AD2d 835 [1997], Iv denied 91 NY2d 814 [1998]; Inter-Power of N.Y. v State of New York, 230 AD2d 405 [1997]), the doctrine is available to toll the running of the Court of Claims Act § 10 limitation periods where its application is “predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct” (Selkirk v State of New York, 249 *950 AD2d 818, 819 [1998]; see also Bullard v State of New York, 307 AD2d 676 [2003]; Commack Self-Serv. Kosher Meats v State of New York, 270 AD2d 687 [2000]; Kaufman v State of New York, 18 AD3d 503 [2005]).
Here, the claim is premised upon the contention that DOCS created a hostile work environment, not upon a discrete instance of discrimination. The claim alleges a pattern of continuing discriminatory practices and that “DOCS has a policy and practice of allowing and condoning discriminatory and retaliatory conduct and allowing the existence of a hostile working environment” (see defendant’s exhibit A, claim, ¶ 31). Thus, even if the shorter period of limitations set forth in Court of Claims Act § 10 (3) and (3-b) applies, the claim as filed and served alleges a continuing course of conduct sufficient to withstand a motion to dismiss on timeliness grounds. As a result, claimant’s motion to amend the claim is not an impermissible attempt to cure a jurisdictional defect, as the defendant contends (cf. Grande v State of New York, supra). Rather, claimant seeks to supplement the claim with additional instances of discrimination, including his suspension from employment and the recommendation by DOCS that he be terminated, both of which occurred subsequent to the date the claim was filed and served. As the Court of Appeals recognized in Boland v State of New York (30 NY2d 337, 341 [1972]), the fact that the wrong was not complete on the date the claim was filed does not mean that before that time there is no wrong. “The ‘complete wrong rule’ was created and applied to save a just claim and to recognize that ordinarily, but not invariably, one sues when one’s damages are ascertained to be complete and calculable” (id. at 341-342). The allegations in the original claim sufficiently set forth a continuing course of discriminatory conduct sufficient to avert dismissal of the claim as untimely. That claimant’s damages, if any, were not complete or ascertainable on the date the claim was filed is of no consequence where, as here, the continuing violation rule is applicable.
Based on the foregoing, the claimant’s motion to amend his claim is granted and the defendant’s cross motion to dismiss the claim as untimely is denied.

 The standards for recovery under the Human Rights Law are the same as the federal standards under title VII of the Civil Rights Act of 1964 (Forrest v Jewish Guild for the Blind, 3 NY3d 295 [2004]; Schenkman v New York Coll. of Health Professionals, 29 AD3d 671 [2006]).